PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* PERFECTO RIVERA, Defendant and Appellant.

No. 4664.  Argued February 3, 1932.—Decided July 29, 1932.

*Angel A. Vázquez* for appellant.   *R. A. Gómez, Fiscal,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

The district attorney of San Juan filed the following information against Francisco Echavarry and Perfecto Rivera:

"The district attorney charges Francisco Echavarry and Perfecto Rivera with the crime of adulteration of milk, a misdemeanor, committed as follows: The said defendants, Francisco Echavarry and Perfecto Rivera, on or about August 21, 1930, in San Juan, P. R., which forms part of the judicial district of that same name, unlawfully, wilfully, and maliciously, sold, offered, kept for sale, and transported as pure, and for human consumption, cow's milk adulterated with water.

"The said defendant Perfecto Rivera, on September 25, 1928, prior to the commission of the offense of adulteration of milk with which he is charged herein, was sentenced by the District Court of San Juan, P. R., to pay a fine of $100 for the crime of adulterating milk, which was paid by him."

When the case was called for trial, both defendants pleaded not guilty.   At the conclusion of the evidence, the court acquitted Echavarry.   The judgment as to Rivera reads as follows:

". . . . and Perfecto Rivera is found guilty of the crime of adulterating milk and is sentenced to six months' imprisonment in jail, to pay a fine of $500, and to have any license he may be holding for the sale of milk canceled, without costs, as he is insolvent."

Feeling aggrieved by that judgment, Rivera appealed.   In his brief he assigns two errors, thus:

"1. The judgment is contrary to law and the evidence since there is no evidence sufficient to convict the defendant, nor as to the legal standard or grade that the milk should contain in order that it may lawfully be sold.

"2. The judgment is void."

886

Let us consider the first error.

It appears from the transcript of the evidence that at the commencement of the trial the defendant said:

"We admit the report of the expert as to the milk having turned out to be adulterated, and we are willing to admit that this defendant is not a second offender but that he was previously convicted of the crime of adulterating milk; the defendant admits this to be true . . . .

"District Attorney: In other words, he pleads guilty of a subsequent offense.

"Defendant: We admit, for the purpose of the record, that he was convicted."

The prosecuting attorney did not offer any evidence either in regard to the existence of a second offense or as to the result of the chemical analysis of the milk seized. He introduced two witnesses, Víctor M. Morales and José Fonfría. The former, who is a health inspector, testified in part as follows:

"Q. Tell us what you know about this case.—A. On August 21, 1930, inspector José Fonfría and myself personally went to a milkshop belonging to Francisco Echavarry and located in Pelayo Street, Puerta de Tierra, Municipality of San Juan, for the purpose of taking a sample of the milk. We filled three bottles into which we poured five drops of formaldehyde and which we sealed and labeled 'Perfecto Rivera.' We took one bottle to the laboratory, another to the office of the local health inspector, and the other was left with the defendant.—Q. For what purpose was that milkshop kept?—A. For the sale of milk.—Q. How many doors did it have? —A. One.—Q. Were there people buying milk?—A. Yes, Sir.—Q. From where was the sample taken?—A. From a kerosene can that contained approximately ten liters of milk.—Q. Who was retailing the milk?—A. Perfecto Rivera.—Q. Who owned the milkshop?—A. Francisco Echavarry.—District Attorney: That will be all. Defendant: Q. Who was buying there?—A. A woman and two or three children.—Q. What was the woman's name?—A. I do not know; I did not ask her.—Q. Do you know how much milk she was buying? —A. I do not remember. Q. Did you see the children buying?— A. I do not remember either.—Q. Do you not know the children's names?—A. No, sir.—Q. From where did you take the sample?—

A. From a kerosene can.—Q. Is that a container?—A. Yes, sir.—Defendant: That will be all."

Fonfría, another health inspector, corroborated the testimony of Morales as to the fact of having been at the milk-shop and of having taken the three samples of milk. He said nothing regarding the sale of milk by the defendant. He was not examined in that respect.

The evidence for the defendant consisted in the testimony of the defendant himself and of other witnesses who corroborated him. The defendant testified partly as follows:

"Q. Explain to the court what happened on that day in connection with the health inspectors and the milk.—A. About 8 a. m. on Thursday, August 21, we were waiting for the milk the delivery of which had been delayed, and when the milk arrived Morales and Fonfría came to the shop and took a sample from the same milk which was being received and measured.—Q. Was that milk being sold while being received?—A. No. sir.—Q. Was it being offered for sale?—A. No, sir. We were measuring it and getting ready to test it with the lactometer to find out if it was in proper condition for selling."

In rendering judgment the district judge expressed himself as follows:

"It has been shown by the evidence for the prosecution in this case that the milkshop was open to the public, that defendant Perfecto Rivera was in charge of it, and that he sold milk from a kerosene can, which milk turned out to be adulterated with water.

"In the *Ríos* case, 28 P.R.R. 711, the defendant was discharged because the milk had been taken from certain cans and there was evidence tending to show that said cans lay outside the shop and the defendant did not want them brought inside; that a policeman testified that the defendant had some cans on the sidewalk adjacent to his milkshop which were obstructing transit, and that he did not want them brought inside until they were inspected by the health officers.

"And there was also evidence regarding the testimony of the person to whom, according to the inspector, the milk had been sold; and the inspector himself, on cross-examination by the defense, stated that he did not know where the milk sold to such person had been taken from. Under those circumstances, of course, there was

no evidence on which to base a conviction, but in the instant case it has been shown that the milk was taken from the can and then sold, and that the establishment was one for the sale of milk to the public.''

We think that the evidence is sufficient as to the adulteration. The admission of the defendant was made without qualification.

There is no evidence as to the transportation. There is evidence, although conflicting, as to other modes of the crime —selling, offering, or keeping for sale. Was the conflict correctly decided? We think so. No showing was made of passion, prejudice, or partiality, nor of manifest error. Is the remaining evidence sufficient? Since the trial court gave credit to that of the prosecution, it can not be said that it failed to show the existence of a stand which was devoted to the sale of milk and was in charge of the defendant; that adulterated milk was kept for sale therein; that people were buying the milk; that it was served by the defendant, that is to say, he was the salesman; from which facts it is inferred that it was sold for human consumption.

Let us consider the second error assigned. All the appellant says in his brief with reference thereto is the following:

''The claim that the judgment in this case is void, is based by the defendant-appellant on the following grounds:

''He was charged with the crime of selling, offering, keeping and transporting as pure, cow's milk adulterated with water, to be used for human consumption (Tr., p. 1); but according to the judgment he was convicted of adulterating milk, (Tr., p. 3), which is a different thing. Perfecto Rivera was not charged in the information with the latter offense and, therefore, he has been convicted of a crime of which he was not informed.

''Under these circumstances, the defendant contends that the judgment is void.''

In *People* v. *Bermúdez,* 35 P.R.R. 546, 547, this Court said:

''The defendant is also wrong in contending that the judgment fails to specify the offense of which he was convicted, for although it is true that after trial he was found guilty by the trial judge, who

did not specify the offense of which he was found guilty, it is stated in the judgment entered in the trial court that he was convicted of the offense of adulterating milk.

"It is true that that is very general, but the judgment may be corrected on appeal so as to make it more specific, to read that the defendant was found guilty of the offense of keeping adulterated milk for sale. *People* v. *Alvarez,* 21 P.R.R. 80; *People* v. *Trinidad,* 24 P.R.R. 826; *People* v. *Bauzá,* 34 P.R.R. 319."

The above quotation, if applied, would be sufficient to conclude that the judgment now under consideration is not void, but erroneous and can be corrected on appeal. But there is more.

Section 337 of the new Penal Code as adopted in 1902, forming part of Title XLV which treated of "Crimes against the public health and safety," made it a misdemeanor to adulterate or dilute any articles of food . . . . . with a fraudulent intent to offer the same or cause or permit them to be offered for sale as unadulterated or undiluted, or to fraudulently sell, keep, or offer for sale the same as unadulterated or undiluted.

In view of the repeated adulterations of milk which caused so much injury to the health of the public in general and of the children in particular, the Legislature, in 1909, amended section 337 and provided that in all cases in which the adulterated article is milk, the person guilty of such adulteration, keeping or offering for sale such article, shall be sentenced to imprisonment for a term of from two to six months, the punishment in the case of a second offender being much heavier. Exclusive jurisdiction thereof was conferred on the district courts.

That reform proved inadequate to stop the violations. The establishment of a fraudulent intent in every case rendered a conviction difficult; and on the following year the Legislature passed "An Act to provide a punishment for adulterating milk or offering or keeping the same for sale." In this Act the words ". . . . . . *adulterates* . . . . . . *with fraudulent intent,* . . . . . . *and* . . . . . . *fraudulently sells,*

. . . . . ." were substituted by the words ". . . . . . *adulterates* . . . . . ., *with the intent to offer the same* . . . . . ., *and every person who sells,* . . . . . ." The minimum penalty for a first offense was reduced to one month, but the same penalty was retained for subsequent offenses. Exclusive jurisdiction continued to be vested in the district courts, and the mode of proving the adulteration or dilution was prescribed.

The Act of 1911 was repealed in 1925, being substituted by Act No. 77 of 1925, entitled: "An Act providing punishment for the adulteration of milk and for other purposes." This act is still in force. Section 1 thereof begins as follows: "Every person who adulterates or dilutes milk and every person who sells, offers or keeps for sale, or who transports or stores milk to be used for human consumption, . . . . . ."

The penalty fixed for first offenders was still further reduced, but the penalty for second offenders continued to be the same, and the transportation or storage of milk to be used for human consumption was added as an offense. In the title of the act the term *"adulteration"* only was preserved.

Are we here concerned with distinct offenses or with a single one which can be committed in several ways? If the former, we would have to amend the judgment; if the latter, even this would not be necessary.

On the first pages of the second volume of Corpus Juris, there appears an article by Professor Throckmorton, of the University of Indiana, on *"Adulteration."* First, this term is defined. Then the statutory rules are dealt with, and immediately thereafter the nature and elements of the crime are discussed. From the latter part of said article we transcribe the following:

"It is a common-law offense to sell or otherwise furnish adulterated articles of food calculated to injure health, or to mix unwholesome or poisonous ingredients in food or drink designed for any person, whether such acts are done through malice or a mere desire of gain.

"The law governing the offenses of adulteration, or of selling adulterated food is for the most part laid down by statutes defining the offenses.

"In many cases the statutes prescribe a standard or test by which it may be determined whether an article is adulterated, and, if the article falls below the standard thus prescribed, it is to be deemed adulterated, although in fact it may be wholesome or harmless, and may contain no foreign ingredient.

"The statutes are generally directed against sales of adulterated articles or having them in possession with intent to sell, and under some of the statutes the use to which the article sold is to be put is a material element in determining whether the sale is unlawful." 2 C. J. 3, 4, 5.

The last part of the article is entitled "Criminal Prosecutions," and we quote therefrom as follows:

"Criminal prosecutions for adulteration as a common-law offense are governed by the rules relating to prosecutions for common-law offenses in general.

"Indictments or complaints for the selling or having in possession adulterated substances, being based upon statutes defining the offense, will be held sufficient when they substantially follow the words of the particular statute under which they are drawn and allege all the facts and circumstances necessary to bring defendant within the terms of the statute creating and defining the offense." 2 C. J. 8, 9.

The citations refer us to volumes 12, 19, and 22 of Cyc. We will confine ourselves to the two following quotations:

"The act of selling or exposing for sale are considered in law one offense, and the mere fact that the offense is thus alleged in the indictment will not render it defective on the ground of duplicity." 19 Cyc. 1100.

"It is a well settled rule of criminal pleading that when an offense against a criminal statute may be committed in one or more of several ways, the indictment may, in a single count, charge its commission in any or all of the ways specified in the statute. So where a penal statute mentions several acts disjunctively and prescribes that each shall constitute the same offense and be subject to the same punishment, an indictment may charge any or all of

such acts conjunctively as constituting a single offense. Or as the same rule is frequently stated, where a statute makes either of two or more distinct acts connected with the same general offense and subject to the same measure and kind of punishment, indictable separately and as distinct crimes when each shall have been committed by different persons and at different times, they may, when committed by the same person and at the same time, be coupled in one count as together constituting but one offense; and this is true, although a disjunctive particle is not employed in the statute, but a conjunction is used which is disjunctive in sense.'' 22 Cyc. 380, 381, 382.

Thus, it may be seen that under the general title of ''Adulteration'' all the modalities of the offense are dealt with, as has been done by the Legislature of Puerto Rico in the law on the matter now in force. The adulteration is the basis. The act itself would amount to time and money badly wasted and nothing more. It is after the adulteration, when the adulterated article is introduced into the commerce of man, thus perpetrating the deception and the injury to health, that the criminal act arises. That being so, we fail to see that it was error to charge in general the crime of ''adulteration of milk,'' as was done by the district attorney in the instant case, even though what was alleged in the body of the information was that the defendant ''sold'' . . . . . . adulterated milk, nor to convict the defendant of ''the crime of adulterating milk'' under such information.

Nothing is said by the appellant in his brief as to the second offense, and since it was admitted that there had been a previous conviction also for adulterating milk, a subsequent offense clearly existed.

The judgment appealed from must be affirmed.

Mr. Justice Córdova Dávila took no part in the decision of this case.